# CELIA SUE JOHNSON *v.* LEONARD J. NADWODNY ET AL.

[No. 1533, September Term, 1982.]

*Decided June 16, 1983.*

The cause was argued before LOWE, ALPERT and BLOOM, JJ.

*William A. Beale,* with whom was *William J. Skinner* on the brief, for appellant.

*Roger A. Perkins* for appellees Nadwodny et al. *John H. Bolgiano,* with whom were *Phillips P. O'Shaughnessy* and *Smith, Somerville & Case* on the brief for appellees Duvall, Jr., and Dietz, Ebersberger, Duvall & Hall Chartered. *Cynthia E. Young* and *Archie C. Hall* on the brief for appellee Johnson.

LOWE, J., delivered the opinion of the Court.

This case, appealed from the Circuit Court for Anne Arundel County, was concluded on the trial judge's grant of appellees' motions for directed verdicts on the only counts appealed here (fraud and conspiracy to defraud). The decision was based upon his holding that the cause of action (for fraud and conspiracy to defraud) was not filed within the three year period of limitations pursuant to Md. Cts. & Jud. Proc. Code Ann. § 5-101 (1980 Repl. Vol.) which provides that:

> "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."

The primary issue on appeal is whether:

"The Trial Court erred in directing verdicts in favor
of all Defendants on the basis of the Statute of Limi-
tations when the facts, viewed in a light most
favorable to the Plaintiff, showed that she could not
have discovered her causes of action for fraud and
conspiracy to defraud."

The docket entries show that the fraud suit was filed June
19, 1981, alleging that appellant and appellees had collabo-
rated in what appeared to be a joint venture to purchase and
operate a restaurant. The cause of action thus must have
accrued on or after June 19, 1978 if limitations is not to be
a bar. At settlement on June 17, 1975, appellant signed
papers, apparently without reading them, that assigned her
interest in the contract of sale to L.C.D., Ltd., one of the
appellees, whereupon another appellee, Nadwodny, pur-
chased by deed propitiously recorded, the restaurant real
estate in his name alone. Relying upon appellee-attorney,
appellant presumably assigned her rights in exchange for a
stock option in L.C.D., Ltd., the corporation which the
venturers had formed (the stock of which was held solely in
the name of the new restaurant owner and his sons). Appel-
lant apparently believed this corporation would take or had
taken title to the restaurant despite her assignment during
her participation at the settlement.

She and her husband (another venturer and appellee here)
worked in the restaurant for wages, but she contended that
her managerial capacity was assumed in reliance upon her
belief that she had a stock option at her individual election.
On February 22, 1977, appellant's employment role with the
restaurant was involuntarily terminated and she was "told"
to leave her husband. Despite assurances that her interest in
the restaurant would be "taken care of", appellant became
apprehensive and, upon the suggestion of appellee-attorney,
consulted a Montgomery County attorney named "Len
Cardy" in March of 1977. In that same month, without fur-
ther explanation regarding Mr. "Cardy", we are told by the
declaration that:

"Plaintiff [appellant] became concerned about her portion of the stock option and consulted an attorney, T. Joseph Touhey, Esq., about how to proceed."

Correspondence from Mr. Touhey to appellant dated May 31, 1977, assured her that, under Maryland law, her stock option was not exercisable without the consent of every stockholder in the close corporation; that the other stockholders would not consent; and such a representation was fraudulent but could be overcome by court action although "time was of the essence" in procuring a judicial remedy. He proceeded on her behalf to attempt to obtain (by an equity suit requesting specific performance) the exercise of her stock option. For reasons not here relevant the suit did not succeed despite the subsequent intervention of another attorney in the suit on her behalf. A fourth attorney, her present one, also intervened in the litigation but was unable to breathe new life in the equity suit commenced in May-September, 1977.[1] The fraud theory was then addressed by that attorney in the suit filed on June 19, 1981, which was tried the following year and terminated by a verdict directed against appellant as we have indicated.

Because the focus of this appeal is upon the judge's determination that the cause of action accrued more than three years before suit was filed, an initial controversy arises concerning our standard of review. In determining the accrual date of the cause of action, appellant contends that the trial judge (and we upon review) must view the facts in a light most favorable to the plaintiff-appellant to determine whether she could have discovered her causes of action for fraud and conspiracy to defraud.

Appellees precipitiously contradict that assertion and contend that our recent decisions in *Decker v. Fink,* 47 Md. App. 202, 211 (1980) and *Moy v. Bell,* 46 Md. App. 364, 368-370 (1980), expressly state that the application of limi-

---

1. He did, however, obtain in another action, a divorce from her husband for her. A fifth attorney, William A. Beale, joined the fourth as co-counsel for this appeal. He did not participate in the trial of the case.

tations is strictly a legal question and the facts necessary to determine its application must be judicially determined. We noted that while trial judges (and this Court on appeal) view evidence, for purposes of motions to dismiss or for directed verdicts, solely for its legal sufficiency in the light most favorable to the plaintiff, that test does not apply in regard to legal questions such as limitations of actions.

Those cases, however, were predicated upon the then held general rule that the running of limitations against a right or cause of action is triggered (accrued) upon the occurrence of the alleged wrong and not when it was discovered. *Leonhart v. Atkinson,* 265 Md. 219, 223 (1972). The factual findings to determine when a wrong occurred were minimal, seldom in conflict, and in most instances either uncontroverted or even set out in the plaintiff's own pleadings. The strictly legal question of applying a limitations statute from the accrual of the occurrence of the alleged wrong entailed few, if any, of the requisite factfinding insights, such as drawing inferences, weighing conflicting testimony and judging credibility of witnesses.

The "discovery" rule for determining when a cause of action accrues has, however, been substituted by the Court of Appeals (in *Poffenberger v. Risser,* 290 Md. 631 (1981)), for the occurrence-of-the-wrong rule in all actions. Thereafter, a cause of action accrues for purposes of limitations when the claimant in fact knew, or reasonably should have known, of the wrong. *Id.* at 636. This change traumatically affected the relative ease with which a court could apply limitations as a matter of law because the crucial accrual date is no longer so clearly ascertainable. Holding that constructive notice which rests on strictly legal presumptions does not constitute the requisite knowledge within the meaning of the rule, the *Poffenberger* Court explained that

"the discovery rule contemplates actual knowledge — that is express cognition, or awareness implied from

> knowledge of circumstance which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Id.* at 637.

Actual knowledge is usually uncontroverted and may be as easily ascertainable as the occurrence of wrong. Implied notice, however, is simply circumstantial evidence known to the claimant which would lead him, "by the exercise of due diligence", to the knowledge of the principal fact. It arises from inferences of fact upon which it rests, and as such brings into play all of the insights required of and reserved for a factfinder. See *Poffenberger, supra* at 637.

Even before the general adoption of the discovery rule in Maryland, the Legislature long ago adopted an equitable principle comparable to the discovery rule to apply even in law cases where a party is kept in ignorance of a cause of action by the fraud of an adverse party. *Wear v. Skinner,* 46 Md. 257 (1877). It was enacted in 1868 by the Legislature and was the predecessor of Md. Cts. & Jud. Proc. Code Ann. § 5-203 (1980 Repl. Vol.), which states that:

> "If a party is kept in ignorance of a cause of action by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud."

The statutory test of "ordinary diligence" parallels the *Poffenberger* implied knowledge test of "ordinary prudence" and the cases under the statute offer some guidance then for the direction which may be taken by the Court of Appeals under that prong of the *Poffenberger* test. Significantly for our purposes, the determination of when a plaintiff (having properly invoked the rule, *Piper v. Jenkins,* 207 Md. 308, 318 (1955)) had exercised due diligence, was ordinarily a question for the trier of fact, *Herring v. Offutt,* 266 Md. 593 (1972), or, as more colloquially termed, a "jury question".

*New England Ins. Co. v. Swain,* 100 Md. 558 (1905); see also *Henderson, Ex'r v. Henderson and Egnor,* 54 Md. 332 (1880). Whether the *Poffenberger* adoption of the discovery rule generally will cause the determination of disputed and obscure accrual dates to be submitted to factfinders in all cases is an issue we hope, in light of the predictable influx of post *Poffenberger* cases, to have addressed by the Court of Appeals before we are faced with the deluge which appears already to have commenced.

For purposes of this case even if we look to past precedent in those cases of allegedly concealed causes of action for fraud (all of which seem to have been submitted to finders of fact), we still find no error in the directed verdict because express knowledge of the cause of action not only was admitted by appellant, but was set forth in her own pleadings, leaving no issue of fact for the jury to determine in that regard.

Before addressing the facts presented at trial and the holding on the motion for directed verdict, however, in order to avoid a blurring of the "fraud" allegations to be considered here, it is significant that under § 5-203, when referring to an action for fraud that has been allegedly concealed by the fraud of the adverse party, the statute does not require that in all cases the party must commit a second fraud distinct from, and independent of, the original fraud for the purpose of keeping the party in ignorance of his cause of action. The original fraud may in some cases be of such character as to conceal itself, causing the injured party to remain in ignorance without any lack of diligence on his part. *Swain, supra* at 572; *Wear v. Skinner, supra* at 267.

In the case before us, the alleged fraud was so "inherently concealed" that the court below could find little, if any, evidence that it had even been perpetrated.

> "I cannot believe . . . and I don't think there's any evidence at all . . . to indicate there was any fraud at that time or any intent to defraud . . . ."

But he held "first and clearly and foremost . . . that the facts would in no way take this case beyond what I find to be the limitations period . . . .", and for that primary reason he directed the verdict in favor of appellees.

While we too had trouble ascertaining the nature of the fraudulent act committed by appellees (and appellant was equally perplexed in pinpointing it at argument), that wrong obviously must be (and should have been) first identified. From the pleadings and the record as well, the principal fact constituting the wrong appears from the declaration to have been an alleged fraud upon appellant and a conspiracy to defraud her

> "by getting her to assign her rights in the March 25, 1975 contract to L.C.D. Ltd. in exchange for an unlawful and unenforceable stock option which [the defendants-appellees] knew was false on its face."

The accrual date of the cause of action, then was when she actually discovered the unenforceability of the option or when she had such knowledge of the circumstances as ought to have put a person of ordinary prudence on inquiry. *Poffenberger, supra* at 637.

Because the accrual date of the cause of action in fraud cases is customarily a jury question, our duty on appeal is to determine if there was any evidence viewed in the light most favorable to appellant, from which a reasonable factfinder might have concluded that the failure of consideration (which we must assume for these purposes was fraudulently contrived) was obscured either by appellees or by the nature of the allegedly fraudulent act itself. We found none whatsoever, but to the contrary, the record disclosed concession after concession by appellant and her counsel not only that she knew that the option was unenforceable over three years before she filed suit, but that she was also actually on notice that it was or could have been fraudulent.

At argument before the trial judge, her counsel conceded that when she was fired as restaurant manager she should have thought to (and did) take action; that when she sued for

specific performance in mid 1977, she could by reasonable diligence have discovered her present cause of action; that on September 11, 1977, when her husband-appellee refused (by affidavit notarized by attorney-appellee) to join her in exercising her option she should have discovered (or did discover) the fraud.

Even more significant, however, was appellant's own testimonial admission that her former attorney, Mr. Touhey, had by letter dated May 31, 1977,[2] advised her that the position of the appellee-owner of the corporation constituted fraud and conspiracy. She admitted during her testimony that

> "[h]e advised me that there was fraud and conspiracy that's what that letter says."

The evidence alluded to here, as well as other evidence we have not addressed, shows that the judge was correct in holding that appellant knew or indisputably should have known of her cause of action more than three years before suit was filed on June 19, 1981, and that there was a dearth of evidence from which a jury could have concluded the contrary.

The judge found that she was diligent and did propitiously retain counsel; but the fact that he did not immediately assign what she now believes to be an appropriate legal label to her alleged wrong was not evidence of concealment by appellees. The judge did not feel that the question of her diligence, although abundant, was sufficient to warrant a jury determination because it was that very diligence in pursuing a remedy for her purported wrong that caused her and her attorney to concede that she knew, or most assuredly should have known, of the legal unenforceability of the stock option which she had received as a quid pro quo for assigning her interest in the sales contract.

---

**2.** The letter is referred to as Exhibit "B" in the testimony. Although appellant contends it was not admitted, nothing in the extract indicates other than that it was a part of the evidence.

Appellant's preoccupation with the judge's recognition of her "diligence" in pursuing a remedy for her alleged wrong seems to arise from § 5-203, the statute for computing time by determining accrual dates in limitations actions where a party is kept in ignorance of a cause of action induced by fraud. But even applying this statute the principal fraud alleged was in no way concealed or attempted to be concealed. Nor was there the slightest evidence of a confidential relationship relied upon by appellant to excuse her failure to discover the alleged fraud. *Herring v. Offutt, supra* at 600. Assuming (but *certainly* not deciding) that the husband-wife relationship was evidence of a confidential relationship suggesting reliance by appellant, her own testimony showed quite the contrary. Indeed, she testified to their open alienation at the time of her firing, and ultimate divorce. The further suggestion that she may have relied upon the attorney-appellee as a confidant is contradicted by her own testimony that it was he who recommended she retain an attorney at the time of her firing. Her own testimony, therefore, evinces that there was no evidence of fraud perpetrated to keep her in ignorance of her cause of action. The only obscurity was her own lack of knowledge of the law.

Appellant admitted that the unenforceability of the option was known to her by way of court adjudication more than three years before her present cause of action, and it was even described to her as fraudulent by her then attorney. Such knowledge of her cause of action more than three years before she sued, if not actually known (connoting legally understood) to her, was imputable to her through her counsel as a matter of law.

The judge did not err in granting the motion for a directed verdict on the ground that appellant was barred by limitations as attested by her own evidence. In fact, because her own pleadings containing Mr. Touhey's May 31, 1977 letter to her clearly indicated that she had actual notice of the imputable knowledge of her cause of action more than three years before she actually sued, summary judgment would have been appropriate when sought. Certainly, in light of

her subsequent testimony, the directed verdict was appropriate.

Appellant also complains that:

> "The Trial Court erred in denying Plaintiff's Motion for Continuance on the basis of the unavailability of a key witness."

The "key" witness was her former attorney T. Joseph Touhey, whom she had subpoenaed for May 26 or 27, 1982. Mr. Touhey sought to quash the summons or be relieved until after May 29, 1982, which relief was granted by a judge of the court other than the trial judge, who extended the summons until June 1, 1982. On May 25, 1982 appellant filed a motion for continuance predicated upon Touhey's unavailability, despite her having been consulted and having conceded in her motion that the extension date was "as a matter of compromise".

The motion to continue the case recited the anticipated testimony of Mr. Touhey, who had previously been deposed by appellees in appellant's presence, all of which would have been cumulative. She stressed that his testimony "goes to the issue of plaintiff's diligence in understanding and pursuing the true nature of her cause of action", which testimony and appearance she alleged were "proper subjects for the jury to take into consideration." [3] But as the trial judge pointed out, Mrs. Johnson was clearly "delinquent" in pursuing a remedy for her wrong and was clearly cognizant of the wrong to which she felt subjected; however, the diligence she exercised easily uncovered all of the *facts* and circumstances which the ingenuity of counsel subsequently labeled fraud. The principal facts underlying the alleged fraud were known to her and to all of her counsel by her own admissions in pleadings and testimony. In the instant case, as we have pointed out, the trial judge could find no evidence

---

3. Md. Rule 527 c 2 provides that the affidavit shall allege not only the affiant's belief that the testimony is proper for consideration but rather that

> "the action cannot be tried with justice to the party without such evidence . . . ."

of fraud sufficient for jury submission, but, nonetheless, assumed it as alleged for the purpose of determining the application of limitations from appellant's own evidence.

Furthermore, the judge did not expressly deny the motion and procedurally we find that the judge was never asked to rule upon the motion. While it is admittedly important that all motions be decided by a trial judge, *Brice v. State*, 254 Md. 655 (1969), it is the responsibility of the movant to bring them to the attention of the trial judge prior to the conclusion of the trial. *White v. State*, 23 Md. App. 151, 156 (1974). In the absence of a "*de jure* ruling by the trial court" we will not assume, as appellant would have us do, that the motion was "*de facto* overruled" by the grant of the directed verdicts. If the motion was not of sufficient importance to the appellant at the time to ask for a ruling from the court, we will treat the motion with the same degree of attention given it by appellant and consider that she has waived her rights to have a ruling on it. *White, supra.*

While it is not a matter of record for our consideration on appeal, appellee-attorney noted that:

> "It is specifically recalled that the motion in question was submitted to the trial court on the morning of the first day of trial and that the trial court informed appellant's attorney that the Court would not allow a hiatus of a day or two in the trial procedure, but gave the appellant the option as to whether or not appellant desired a general continuance of the trial until a later date. Appellant elected to proceed with the trial and the matter was dropped. Appellant presented her proof and closed her case without a request for an opportunity to call the witness on the following court day."

We admonish appellee-attorney that matters not ascertainable from the record should not be factually relied upon in argument. We also admonish appellant, however, that if those facts are true, the raising of this issue on appeal, after

having accepted the alternative offered, smacks somewhat of appellate sandbagging.

*Judgments affirmed.*
*Costs to be paid by appellant.*