## MARCIA S. DECKER v. GERALD H. FINK

[No. 246, September Term, 1980.]

*Decided November 12, 1980.*

The cause was argued before THOMPSON, MOORE and LISS, JJ.

*Donald P. McLaughlin,* with whom were *Powers & McLaughlin* on the brief, for appellant.

*William A. Ehrmantraut,* with whom were *Kenneth*

*Armstrong* and *Donahue, Ehrmantraut & Montedonico, Courtland K. Townsend, Jr.,* and *Mannes, Meyers, Nadonley, Townsend & O'Brien* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

In April, 1965, Marcia J. Decker, appellant, then age twenty-nine, consulted Dr. Gerald H. Fink, appellee, a practicing psychiatrist, for assistance for certain mental and emotional problems she was then experiencing. The appellant commenced a course of psychotherapy treatments which required weekly fifty minute visits to the doctor's office located in his residence. Appellant subsequently went into psychoanalysis, a more intense form of treatment, which required four visits a week. Treatment consisted of the appellant lying on a couch and relating to the appellee her innermost thoughts, emotions, dreams, desires and conflicts, the objective being to resolve these conflicts through the process of analysis.

On March 7, 1977, appellant filed, in the Circuit Court for Montgomery County, a one count declaration against the appellee, claiming medical malpractice and alleging that during the course of psychoanalysis at the doctor's office he improperly manipulated the analysis for the purpose of engaging in sexual relations with the appellant, and that as a result of the appellee's actions, the appellant's mental and emotional condition worsened. The appellee filed a general issue plea and a special plea of limitations. The appellee denied a sexual relationship ever existed between the appellant and himself at any time and contended further that his professional treatment of the appellant terminated in December, 1971.

On January 7, 1980, a jury trial of the case began, and at the close of appellant's case, appellee moved for a directed verdict on the grounds that the patient-physician relationship terminated in December of 1971, or alternatively, that the appellant knew or reasonably should have known of the appellee's alleged malpractice before March, 1974. The trial judge granted appellee's motion for a

directed verdict on March 17, 1980 finding as a matter of law that the appellant knew or in the exercise of reasonable diligence should have known of the alleged malpractice of the appellee in May of 1973, and that the appellant's declaration filed in March of 1977 was barred by limitations. It is from this judgment that appellant has filed the instant appeal.

Appellant raises two questions for determination by this appeal:

1. Whether the impairment of appellant's judgment which she contends resulted from the transference phenomenon during the course of the psychoanalysis by the appellee was sufficient to toll the running of the statute of limitations?

2. Whether the trial court erred in ruling as a matter of law that the appellant knew or in the exercise of reasonable diligence should have known of the alleged malpractice of the appellee in May of 1973, and that the claim of appellant filed in March of 1977 was barred by limitations?

1.

Appellant offered testimony of experts that an essential element of successful psychoanalysis is the creation of a special relationship recognized in the field of psychiatry as the transference phenomenon. That phenomenon, she contends, gives rise to an emotional reaction by the patient to the analyst which produces an ancient and subconscious parent-childlike relationship, as a result of which the patient is freed of the necessity to interact with the analyst on the level of an adult face-to-face relationship, and the patient is thus permitted to focus on her innermost thoughts and feelings which may then become subject to free association and lead to the resolution of the patient's emotional conflicts. Inherent in the transference neurosis is the development of a strong dependence by the patient upon the analyst and an extraordinary faith and trust in him which may frequently develop into a love relationship and

which can deprive the patient of her independent judgment and ability to distinguish the reality of her interaction with the analyst and vice versa. Further, such a phenomenon renders the patient vulnerable and susceptible to the influence and suggestion of the analyst. Appellant testified that after receiving psychotherapy and psychoanalysis from the appellee from April, 1965 to February, 1971, appellee commenced a sexual relationship with her during each and every visit to his office thereafter until the end of the summer of 1975. Early in 1971, appellee suggested that treatment be concluded at the end of that year. Regular treatment was, in fact, terminated at that time. Appellant testified that due to her strong feelings for the appellee and her emotional and psychological dependence on him because of the transference phenomenon, she was in a state of confusion and anxiety which caused her to consult another psychiatrist whom she saw from April to September of 1973. She told the new psychiatrist of the treatment and relationship between the appellee and herself. She was advised not to continue in psychoanalysis with the appellee, and that treatment of that nature could not be beneficial so long as she continued a sexual relationship with the appellee. She was referred to still another psychoanalyst whom she saw three or four times during the summer of 1973 and to whom she also related her experiences with the appellee. She was advised to continue analysis but with a female physician. She continued analysis with the female doctor from September, 1973 until August, 1976. In the meantime, appellant testified, she continued to see the appellee at his office through the summer of 1975 and psychoanalysis and sexual activity continued at the appellee's office until that time. Appellant stopped treatment with the female physician in August of 1976 and filed suit against the appellee on March 7, 1977.

Maryland Code, Courts and Judicial Proceedings Article, Section 5-101 (1980) provides "a civil action at law shall be filed within three years from the date it accrues. . . ." The statute of limitations as adopted by the Legislature of the State of Maryland reflects what is deemed an adequate

period of time in which a "person of ordinary diligence" should bring his action. *Walko Corp. v. Burger Chef Systems, Inc.,* 281 Md. 207, 378 A.2d 1100 (1977). The legislative policy underlying statutes of limitation include the encouragement of promptness in instituting actions, the suppression of stale or fraudulent claims, and most of all, the providing of the elements of fairness to defendants. Judge Levine, quoting from *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S. Ct. 1137 (1945), in *Walko, supra,* said:

> Statutes of limitation find their justification in necessity and convenience rather than logic. They represent expedience, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. . . . They represent a public policy about the privilege to litigate. [281 Md. at 210.]

Statutes of limitation are to be strictly construed, the courts refusing to give such statutes a strained construction to evade their effect. *See McMahan v. Dorchester Fertilizer Co.,* 184 Md. 155, 40 A.2d 313 (1944).

There are exceptions to the general statutory three year limitation period which are contained in Section 5-101 of the Courts and Judicial Proceedings Article. Two exceptions are statutory and are found in Sections 5-201 and 5-203. Section 5-201 states, in pertinent part, as follows:

Persons under a disability.

> (a) *Extension of time.* — When a cause of action subject to a limitation under Subtitle 1 accrues in favor of a minor or mental incompetent, that person shall file his action within the lesser of three years or the applicable period of limitations after the date the disability is removed.

The statutory disabilities which toll the statute are infancy or lunacy. *Rettaliata v. Sullivan,* 208 Md. 617, 119 A.2d 420 (1956). It is generally recognized that a person may be under the legal disability of insanity, or unsoundness of mind, within the meaning of the exception to the statute of limitations, when the disability is of such a nature as to show him unable to manage his business affairs or estate, or to comprehend his legal rights or liabilities. *Roberts v. Stith,* 383 P.2d 14 (Okla. 1963); *Hurd v. County of Alleghany,* 39 App. Div. 2d 499, 336 N.Y.S.2d 952 (1972). The term "disability" as used in the applicable Maryland statutes has been held to mean ". . . the general disability of lunacy or infancy as to the care of property and the safeguarding of rights." *Funk v. Wingert,* 134 Md. 523, 527, 107 A. 345 (1919).

In *McDonald v. Boslow,* 363 F. Supp. 493 (D. Md. 1973), the plaintiff, while confined at the Maryland Patuxent Institution, brought a Civil Rights Act suit against the director of Patuxent and others alleging violation of his constitutional rights, particularly infliction of cruel and unusual punishment in the nature of beatings and denial of medical attention. The court, applying Maryland law in granting the defendant's motion to dismiss, held that commitment of the plaintiff to Patuxent Institution did not constitute an adjudication of *non compos* sufficient to toll the statute of limitations. The court in analyzing the disability exception to the statute of limitations stated:

> In short, the purpose . . . behind Art. 57, Section 2 [Section 5-201 of the Courts Article] is, the protection of those who suffer from a debilitating incapacity to such an extent as to render them incapable of caring for themselves or their property, and as to render their assent to a contract nugatory. It is to that class of individuals to which the benefit of a tolling of the statute of limitations was addressed, *i.e.,* that group of individuals whose cognitive functioning was so severely impaired as to render them incapable of husbanding a presently existing, known right. [363 F. Supp. at 496.]

Appellant seeks to have this Court add the category of "impaired judgment" to the list of disabilities which will toll the running of the statute of limitations. She offers no authority for that proposition, nor have we been able to find such authority. Even if there were such authority, the factual testimony of the three psychiatrists who treated the appellant during 1973 does not support her contention that she was the victim of impaired judgment which prevented her from realizing that she had a malpractice action against the appellee. Dr. Gross testified that when he saw the appellant she was not psychotic, not hallucinating, but could make decisions. In his professional analysis of the appellant's mental condition, he said:

Q. Now, when she came to you, as I understand it, there was no disassociation, no lack of touch with reality and she was able to make decisions on her own, is that correct?

A. Yes, basically.

Q. I don't want to be just qualified by your term basically. Isn't this what you testified to in your deposition on page 5: "what about decision-making? Was she able to in your opinion, able to make decisions regarding her own welfare, her interests, and things of that nature?" and your answer was "yes." Wasn't that your testimony at that time?

A. I presume it was.

\* \* \* \*

Q. You had mentioned on direct examination that you performed a mental status exam, is that correct?

A. Yes.

Q. And let me correct — you can correct me if I'm wrong, but your mental status exam, as I understand your testimony, indicated she had no delusions, no hallucinations, that she could

> relate with people well or good I think was your expression, that she was in touch with reality, could make decisions. Is there anything else you want to add to that?

A. No.

The record extract discloses that essentially similar testimony as to the appellant's medical and mental condition was given by the other two psychiatrists who saw and treated the appellant in 1973. Appellant's impaired judgment, if it existed, is not sufficient legal justification for failing to file her medical malpractice claim against the appellee within the time allowed by the statute of limitations.

### 2.

Section 5-203 of the Courts Article provides for an exception to the general statutory period in those instances where a party is kept in ignorance of a cause of action by the fraud of an adverse party. That exception is not applicable in this case, and we shall therefore not discuss the legal principles governing those circumstances.

The Court of Appeals enunciated an exception to the strict construction of the limitation statute in the medical malpractice case of *Hahn v. Claybrook,* 130 Md. 149, 100 A. 83 (1917). In that case, the Court adopted the "discovery test" which provides that the statute begins to run from the time of the discovery of the alleged injury or when it should have been discovered by the exercise of due diligence. The discovery exception has been frequently applied in medical malpractice cases in this State since that time. The rule is that when there is a continuing course of treatment the statute does not begin to run until the treatment is terminated. A corollary to this rule is that, if during the course of treatment, the patient learns or should reasonably have learned of the injury sustained by the patient then the statute runs from the time of knowledge actual or constructive. *Waldman v. Rohrbaugh,* 241 Md. 137, 215 A.2d

825 (1966); *Jones v. Sugar,* 18 Md. App. 99, 305 A.2d 219 (1973).[1] As we stated in *Jones,*

> There is no doubt but that in medical malpractice cases in this jurisdiction, the limitation period starts to run when the patient discovers, or by reasonable diligence should have discovered, the negligent act which caused his injury, or in other words that he may have the basis for an actionable claim, whether or not there is a continuing course of treatment. [18 Md. App. at 105.]

There is no statutory definition of when a medical malpractice cause of action accrues, and in the absence of such a definition the resolution of that question is left to judicial determination. *Goldstein v. Potomac Electric Power Co.,* 285 Md. 673, 404 A.2d 1064 (1979); *Harig v. Johns Manville Products Corp.,* 284 Md. 70, 394 A.2d 299 (1978); *James v. Weisheit,* 279 Md. 41, 367 A.2d 482 (1977).

In *Jones, supra,* we cited the philosophy which required the establishment of the discovery rule and the role of the trial judge in applying the rule. Quoting from *Lopez v. Sawyer,* 62 N.J. 267, 271, 300 A.2d 563 (1973), we said:

> The discovery rule is essentially a rule of equity. It has been said that in equity lies its genesis. [Citation omitted.] Like so many other equitable doctrines it has appeared and is developing as a means of mitigating the often harsh and unjust results which flow from a rigid and automatic adherence to a strict rule of law. On the face of it, it seems inequitable that an injured person, unaware that he has a cause of action, should be denied his day in court solely because of his ignorance, if he is otherwise blameless. . . .
>
> It may also be unjust, however, to compel a person to defend a lawsuit long after the alleged injury has occurred, when memories have faded, witnesses have died, and evidence has been lost. After all,

---

1. United States v. Kubrick, 444 U.S. 111, 100 S. Ct. 352 (1980).

> statutes of limitation are statutes of repose and the principal consideration underlying their enactment is one of fairness to the defendant. [Citation omitted.] So in each case the equitable claims of opposing parties must be identified, evaluated and weighed. Where, as is often the case, they cannot be wholly reconciled, a just accommodation must be reached. We think this can better be done by a judge than a jury. [18 Md. App. at 105-06, n. 4.]

Appellant contends the law governing the granting of a motion for directed verdict to be from *Campbell v. Jenifer,* 222 Md. 106, 159 A.2d 353 (1960):

> [The] Court must . . . resolve all conflicts in the evidence in favor of the plaintiff and assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the right of the plaintiff to recover. Or, as it is often stated the evidence must be considered in the light most favorable to the plaintiff. [222 Md. at 110.]

Generally that would suffice; however, in *Moy v. Bell,* 46 Md. App. 364, 368-69, 416 A.2d 289 (1980), we pointed to an added dimension when such motion is predicated upon a purely legal question (such as limitations) which would end the case if, from the plaintiff's own case, that issue is found factually to apply. In such instance the judge becomes the factfinder for purposes of determining the applicability of the statute of limitations and we may not set aside his factual findings unless he was clearly in error. *Id.* at 369; Md. Rule 1086. Applying that standard, there was evidence before the trial court to establish that in May, 1973 the appellant knew or should have known that the appellee's alleged treatment of her and his alleged sexual involvement with her was grossly unprofessional, improper, and harmful to her mental and emotional well being. Appellant admitted that she was so advised at the time she discussed her situation with each of the three psychiatrists with whom she met. The psychiatrist who treated her from April until

September of 1973 testified that he informed her in May of 1973 that a sexual relationship with the appellee was inappropriate conduct, that she should not continue seeing the appellee, and that she should terminate the relationship. He stated that in his opinion such conduct on the part of the appellee, if it occurred, was a violation of medical standards. When asked if the appellant was able to understand the ramifications of continuing the relationship and his advice to terminate it, he testified that appellant understood and appreciated what he was saying.

The trial judge had evidence before him that the appellant knew or should have known in May of 1973 that the alleged sexual relationship between appellee and appellant was inappropriate medical conduct and was detrimental to her mental health and well being. Once this was established, there was no legal excuse for her failure to enter her medical malpractice action against the appellee until ten months beyond the expiration of the three year limitation period.

*Judgment affirmed, costs to be paid by appellant.*