482 A.2d 23

**LUTHERAN HOSPITAL OF MARYLAND**

v.

**Elizabeth LEVY.**

**No. 1718, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Oct. 8, 1984.

Certiorari Denied Feb. 5, 1985.

228

230

Jeanette A. Plante and Ward B. Coe, Jr., Baltimore, with whom were Anderson, Coe & King, Baltimore, on the brief, for appellant.

Benjamin Lipsitz, Baltimore, with whom was Howard J. Needle, Towson, on the brief, for appellee.

Argued Before MOYLAN, BISHOP and ADKINS, JJ.

ADKINS, Judge.

Appellee Elizabeth Levy sued appellant Lutheran Hospital of Maryland for medical malpractice. A jury in the Circuit Court for Baltimore City awarded Ms. Levy $258,-000. From the judgment entered on that verdict Lutheran

appeals. The sole issue is whether Ms. Levy's claim was barred by limitations.

Lutheran raised the issue by plea and by motion for summary judgment which was denied. It fought the same battle with like lack of success at a separate trial of that issue held pursuant to former Md.Rule 501. We reverse because we conclude that the judge who heard the latter proceeding made findings that were not supported by the evidence and that were, therefore, clearly erroneous. We hold that Ms. Levy's claim was barred by limitations as a matter of law.

■ The pertinent statute of limitations is § 5–101 of the Courts and Judicial Proceedings Article which provides:

A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period within which an action shall be commenced.

Under this statute and its predecessors a fundamental question is when a cause of action accrues. As long ago as 1917 the Court of Appeals decided that in a medical malpractice case the time of accrual is when the plaintiff discovered the alleged injury—a date that often occurs much later than the date of performance of the alleged negligent act. *Hahn v. Claybrook*, 130 Md. 179, 100 A. 83 (1917). This "discovery rule" was made applicable to all tort actions in *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981). It is, of course, applicable to the case at bar and the question of when Ms. Levy "discovered" the "injury" for which she sued Lutheran is critical to the disposition of this appeal.[1]

---

1. The discovery rule now has a statutory base in § 5–109 of the Courts Article which provides that "[a]n action for damages arising out of the rendering of or failure to render professional services by a health care provider ... shall be filed (1) within five years of the time the injury was committed or (2) within three years of the date when the injury was discovered, whichever is the shorter." This statute, applicable solely to claims against physicians until its amendment in 1976, does not pertain to the case at bar because it applies only to injuries

■ Under the discovery rule as stated in *Poffenberger,* a "cause of action accrues when the claimant actually knew *or reasonably should have known* of the wrong." 290 Md. at 636, 431 A.2d 677 [emphasis supplied]. Constructive knowledge, moreover, is not enough. The rule

> contemplates actual knowledge—that is, express cognition, or awareness implied from
>
>> knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.

*Id.* at 637, 431 A.2d 677 (quoting *Fertitta v. Bay Shore Dev. Corp.,* 252 Md. 393, 402, 250 A.2d 69 (1969) quoting *Blondell v. Turover,* 195 Md. 251, 257, 72 A.2d 697 (1950)) [bracketing in original].

We turn now to the application of these teachings to the largely undisputed facts before us.

Ms. Levy broke her ankle on October 25, 1973. She was taken to Lutheran Hospital where the ankle was put in a cast. Eventually, a Lutheran physician told her to throw away her crutches, get orthopedic shoes, and walk on the ankle. She was in effect discharged by Lutheran in February 1974.

The ankle continued to give her trouble. In April 1974, Ms. Levy saw a Dr. Wiedmann at Mercy Hospital. According to her testimony, Dr. Wiedmann said her ankle "was all messed up," asked "who the hell told you to walk on that ankle?" and told her her ankle "wouldn't get any better." Ms. Levy said that it was then she first formed the belief that there was a problem.

Nevertheless, Ms. Levy did not then begin to explore the possibility of legal redress. This was apparently because she didn't "know of an attorney to take my case" and

---

occurring on or after July 1, 1976. Ch. 235, Laws of 1976, § 5. Ms. Levy was injured in 1973.

because she thought "you can't do anything to a hospital." In early 1975, however, in a chance conversation in a department store, Ms. Levy was told that a hospital could be sued for negligence and was given the name of a Baltimore City lawyer.

In early 1975 she consulted that lawyer, recounting the history of her ankle problems. So far as the record discloses, the lawyer gave her no legal advice. He did ask her for $50. Because she did not have the money, Ms. Levy proceeded no further with that lawyer. She did consult other physicians. One of them, Dr. Decker, operated on her in March 1975 replacing her ankle joint with an artificial joint.

On April 22, 1975, Ms. Levy retained Baltimore County counsel. On May 2 he wrote Lutheran requesting medical records and x-rays pertaining to Ms. Levy's 1973 treatment there. On the same day he asked for all of Dr. Decker's reports. On June 11 counsel received the Lutheran records and x-ray reports, but the x-ray films were not included. The material received was insufficient to indicate malpractice on Lutheran's part.

Ms. Levy's ankle continued to pain her and to cause her difficulty in walking. On January 12, 1977, almost a year and nine months after Ms. Levy had retained him, counsel asked Dr. Decker for an opinion as to whether there had been malpractice by Lutheran. Dr. Decker replied that without the 1973 x-rays, he could not tell. The next day those x-rays were again requested. On January 14 Lutheran sent them to Dr. Decker.

In July 1977 Dr. Decker fused Ms. Levy's ankle. Later that month (on the 25th) he reviewed the 1973 x-rays and rendered an opinion that malpractice had occurred. Almost a year after that—on June 15, 1978—Ms. Levy filed suit against Lutheran.

> On this state of the record, the trial judge found that the plaintiff [Ms. Levy] became suspicious concerning her physical condition in early 1975 when she visited the office of [the Baltimore City] attorney. This court

further concludes that with the exercise of due diligence a period of approximately six months from that date would have disclosed the existence of a viable claim, although the first lawyer took no action and the second [Baltimore County] lawyer was obviously not diligent in the pursuit of investigation of the claim. Such lack of diligence does not benefit the defendant [Lutheran] inasmuch as suit was actually filed within three years from the date from which the existence of a viable claim should have been known.

Under this reasoning, the cause of action accrued six months after "early 1975"; presumably sometime after mid-1975. Thus, the suit (filed in June 1978) was within the three-year period of limitations. Ms. Levy, although comfortable with the trial judge's conclusion, in addition argues that her cause of action actually accrued in July 1977, when Dr. Decker gave his opinion as to malpractice. It was only then, she contends, that she had "actual knowledge" of a viable claim against Lutheran. She also suggests that because she was "kept in ignorance of a cause of action by" Lutheran's fraud the statute of limitations should be further extended pursuant to § 5–203 of the Courts Article, and that Lutheran was estopped to raise the issue of limitations. We reject all these contentions.

As to the trial judge's findings, we recognize that they are to be tested by the clearly erroneous requirement of Md.Rule 1086. *Herring v. Offutt,* 266 Md. 593, 599, 295 A.2d 876 (1972). *Moy v. Bell,* 46 Md.App. 364, 369, 416 A.2d 289, *cert. denied,* 288 Md. 740 (1980). *See also Johnson v. Nadwodny,* 55 Md.App. 227, 231–33, 461 A.2d 67 (1983) (explaining the discovery rule and the standard of review). But even under the rigorous restrictions of Md.Rule 1086, we hold that the trial judge was clearly erroneous when he decided that Ms. Levy first became "suspicious concerning her condition" (that is "suspicious" that malpractice was involved) when she visited the Baltimore City lawyer. That visit produced no information about malpractice or about

the viability of Ms. Levy's claim. From it she learned only that access to our system of justice is not always easy for the impecunious.

The true significance of the contract with the Baltimore lawyer lies in its manifestation that Ms. Levy had by then been put upon inquiry and was in the process, however halting, of investigating her potential claim. Her notions as to hospital immunity removed, her ignorance of attorneys remedied, she sought a lawyer to discuss redress for the wrong she thought she had suffered. But the critical date was not that of her visit to the Baltimore lawyer; it was the date of her examination by Dr. Wiedmann.

The evidence bearing on this examination permits no conclusion other than that Ms. Levy became aware that she might have been wronged when she consulted Dr. Wiedmann in April of 1974. Although the doctor could not recall just what he had said to Ms. Levy on that occasion, and although he asserted that he had never discussed possible malpractice with her, she insisted that he had asked her "who in hell told you to walk on that ankle?" Regardless of what was actually said, Ms. Levy came away from the visit with a belief that "something wrong had been done." She expressly so stated in her deposition and confirmed this in her testimony at trial.

We are aware that Ms. Levy, with only a ninth-grade education, was a layperson "unskilled in medicine." *Waldman v. Rohrbaugh*, 241 Md. 137, 145, 215 A.2d 825 (1966). Unlike the unsuccessful registered nurse appellant in *Jones v. Sugar*, 18 Md.App. 99, 305 A.2d 219 (1973), she was totally lacking in medical expertise. But the visit to Dr. Wiedmann did not occur in a vacuum. The ankle had given Ms. Levy continuing pain and trouble. The more she walked on it, she said, the worse it got. Between her discharge from Lutheran and her consultation with Dr. Wiedmann she saw another physician. He also asked her who had told her to walk on the ankle. And she herself was the one "who figured something wrong had been done"

after her conversation with Dr. Wiedmann. Even though the "wrong" she then thought existed (being told to walk on the ankle) was not the "wrong" ultimately established (improper casting), she believed that a "wrong" had occurred. Reasonably prompt investigation would have developed its precise nature.

On the record before us, then, a reasonable fact finder could only conclude that in April 1974 Ms. Levy had "knowledge of circumstances which ought to have put [her] on inquiry [thus charging her] with notice of all facts which such an investigation would have disclosed if it had been properly pursued." *Poffenberger*, 290 Md. at 637–38, 431 A.2d 677.

■ The trial judge also held that limitations did not begin to run until six months after the date upon which he erroneously found that Ms. Levy had become "suspicious." This was incorrect as a matter of law. Under the discovery rule as stated in *Poffenberger* limitations begin to run when a claimant gains knowledge sufficient to put her on inquiry. As of that date, she is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation. The beginning of limitations is not postponed until the end of an additional period deemed reasonable for making the investigation. For example, in *Hahn v. Claybrook, supra,* 130 Md. 179, 100 A. 83, the malpractice occurred while a physician treated a patient from 1904–1910. The patient first noticed skin discoloration (apparently caused by the treatment) in 1908. Suit was filed more than three years later. In holding that the action was barred by limitations, the Court of Appeals made clear that the statute began to run in 1908. It was then that there was sufficient indication of the injury to put the claimant on inquiry. *Id.* at 186–87, 100 A. 83. As the Court explained in *Waldman v. Rohrbaugh, supra,* 241 Md. at 145, 215 A.2d 825, the claimant has "the *statutory time* from the moment of discovery, the moment he knows or *should*

*know* he has a cause of action within which to sue." [emphasis supplied].

■ From that date the statute itself allows sufficient time—three years—for reasonably diligent inquiry and for making a decision as to whether to file suit. *See Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 668, 464 A.2d 1020 (1983). This application of the discovery rule serves the legislative policy that underlies the statute of limitations, *id.* at 665, 464 A.2d 1020, and at the same time puts the discovery rule claimant on a par with the claimant who has actual knowledge at the time of the tort such as the normal automobile-accident plaintiff. The latter has three years from the date of the accident within which to investigate further, obtain expert opinion, discuss settlement, and file suit. The former is given the same time period within which to do these things, beginning from the date that circumstances have put her to that inquiry which charges her with knowledge of the additional information that might be gleaned from a reasonably diligent investigation conducted within the three-year period.

In short, under the discovery rule, limitations in this case began to run in April of 1974. Reasonable diligence in securing counsel and pursuing an investigation would have produced all necessary information within three years from that date—April of 1977. Since Ms. Levy's action was not filed until June of 1978, it was barred by limitations unless, as she contends, the statute did not begin to run until July 1977, when Dr. Decker gave his opinion as to malpractice, or unless there was evidence of fraudulent concealment on Lutheran's part or a sufficient basis to raise an estoppel against Lutheran.[2]

---

**2.** Even if we agreed with the trial judge that limitations did not begin to run until some "reasonable" period after Ms. Levy was put on inquiry, it would avail her naught. If we apply the six month grace period used below, the statute would begin to run in October 1974 and would expire in 1977. If we allow a year's grace period, the statute would bar the action, at the latest, in April 1978. We reiterate that suit was not filed until June 15 of that year.

The notion that limitations did not start to run until July 1977 is founded on language contained in *James v. Weisheit*, 279 Md. 41, 44, 367 A.2d 482 (1977). That was a suit to set aside a mortgage on the ground of deceit. The Court of Appeals reasoned that

> the test to be utilized in fixing the accrual date of a cause of action "is to ascertain the time when plaintiff could have first maintained his action to a successful result. The fact that he might have brought a premature or groundless action is immaterial." *W., B. & A. Elec. R.R. Co. v. Moss*, 130 Md. 198, 205, 100 A. 86, 89 (1917). Thus, this cause of action would accrue when the plaintiff could have proved all five of the essential elements of deceit. . . .

Ms. Levy reads this language as teaching that her cause of action did not accrue until she had in hand expert opinion that Lutheran had been guilty of malpractice in 1973—that is, when Dr. Decker rendered such an opinion in July 1977. She is wrong. The *James* court relied on *W., B. & A. Elec. R.R. Co. v. Moss, supra.* The language quoted from the latter case was written in the context of an arrangement for continuing services. It did not involve the discovery rule. All that *W., B. & A. Elec.* held was that a cause of action does not accrue until all the *facts* that are its necessary predicate have *occurred. Id.* [130 Md.] at 204–05, 100 A. 86. The issue was when the services had in fact been completed. As of that date, the cause of action had accrued. *Id.* at 204, 100 A. 86. In *James* the court held that all the elements of deceit existed in fact more than three years before suit was filed. 279 Md. at 46, 367 A.2d 482.

■ In the case before us, all the facts upon which Ms. Levy's claim against Lutheran could be based took place in 1973. But for the discovery rule, her cause of action would have accrued then. Because of the benefits of the discovery rule, the critical date was extended to April 1974, when she was put upon inquiry. No new facts necessary to support the cause of action occurred after that time. All

that did occur thereafter was the receipt of Dr. Decker's opinion, based on pre-existing facts. In *Jones v. Sugar, supra,* we noted that a cause of action accrues "when there are facts known [or with reasonable diligence discoverable] which would serve as the basis of an actionable claim and not necessarily when the patient is informed by counsel that he has a cause of action." 18 Md.App. at 105 n. 3, 305 A.2d 219. The same is true of opinions by medical experts. The crucial date is the date the claimant is put upon inquiry, not the date an expert concludes there has been malpractice. To hold otherwise would frustrate the statute's policy against stale claims and its concerns with fading memories and lost evidence.

Under Ms. Levy's view, all the historical facts pertaining to an injury could occur, the claimant could be well aware that she had been injured, but no cause of action would accrue until, perhaps decades later, an expert concluded that the physical harm had been the result of malpractice. We do not think the discovery rule countenances that.

We are left with the issues of fraudulent concealment and estoppel. They will not detain us long. The former contention is based on § 5–203 of the Courts Article which provides:

If a party is kept in ignorance of a cause of action by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.

The fraud asserted here is Lutheran's failure to produce the x-rays when first requested to do so by Ms. Levy's Baltimore County counsel in May of 1975. The reader will recall that the x-rays were eventually produced in January 1977. Although the issue was raised below, the trial judge did not address it; in view of his treatment of the discovery rule there was no need for him to do so. Since the question was not both raised *and* decided below, we do not have to address it. Md.Rule 1085. We could remand under Md.

Rule 1071. Because, however, we can readily dispose of the argument on the record now before us we elect to do so in order to "avoid the expense and delay of another appeal to this court." Md.Rule 1085.[3]

■■■ The difficulty with Ms. Levy's position is that the record is barren of evidence of fraudulent concealment by Lutheran, a circumstance she was burdened to prove with specificity. *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 241–42, 469 A.2d 867, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984). True it is that Lutheran did not send the x-rays when first requested, although it then furnished all other relevant records. True it is that Lutheran quite promptly furnished the x-rays when they were requested by one of its own defense counsel. True it is that the x-rays were of fundamental importance; it was only through them that Dr. Decker was able to establish Lutheran's negligence in failing to manipulate properly Ms. Levy's broken ankle before casting it. But it is equally true that "[c]onduct less egregious than intentional fraud will not toll the statute of limitations." *Johns Hopkins Hospital v. Lehninger,* 48 Md.App. 549, 562, 429 A.2d 538, *cert. denied,* 290 Md. 717 (1981). Such fraud must be established by clear and convincing evidence, *Finch,* 57 Md.App. at 230, 469 A.2d 867, and the moving party must state with particularity how she was kept in ignorance. *Id.* at 241–42, 469 A.2d 867.

■■■ Just why Lutheran did not furnish the x-rays in May 1975 does not appear from the record. The most that can be concluded is that there was clerical error or negligence. Since x-ray films were kept in a place separate from other hospital records, it is possible that a clerk might have furnished the latter but overlooked the former. But evidence of negligence is not the same as clear and convincing evidence of fraudulent concealment. *See Lackey v. Bullard,* 262 Md. 428, 433–34, 277 A.2d 593 (1971) (mere suspicion is insufficient to show fraud).

---

**3.** For the same reasons we also address *infra* the estoppel issue.

■ Despite this, Ms. Levy seems to argue that we should engage in some kind of balancing of what she sees as the equities, since the discovery rule is a rule of equity. We made clear, however, in *Decker v. Fink,* 47 Md.App. 202, 209–10, 422 A.2d 389 (1980) and *Jones v. Sugar, supra,* 18 Md.App. at 104, 305 A.2d 219, that it is the discovery rule itself that is the product of equitable considerations. When the rule pertains, its application must be governed by the usual principles relating to the statute of limitations. To hold otherwise would be to subvert the legislative policy embodied in the statute. *See Johns Hopkins Hospital v. Lehninger, supra,* 48 Md.App. at 562, 429 A.2d 538.

■ Moreover, a party asserting fraudulent concealment under § 5–203 must have exercised ordinary diligence to protect her rights. *Johns Hopkins Hospital v. Lehninger,* 48 Md.App. at 562–63, 570, 429 A.2d 538. An unfulfilled request for x-rays in 1975, with no further request (so far as the record shows) until January 1977 is simply not evidence of ordinary diligence, as the trial judge found. Since the x-rays were promptly produced after counsel's second request in 1977, it is not unreasonable to assume that a second request made shortly after they were not furnished in 1975 would have brought forth the x-rays in good time. The fraudulent concealment claim fails as a matter of law.

■ So it is with the estoppel contention. As we recognized in *Johns Hopkins Hospital, supra,* a party may be estopped from asserting the statute of limitations. But estoppel will not be applied "absent clear and convincing" evidence "of some unconscientious, inequitable or fraudulent act ... upon which another has relied and has been misled to his injury." 48 Md.App. at 563, 429 A.2d 538. *See Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972). No such act appears here.

■ Furthermore, for estoppel to be raised successfully, the plaintiff must be diligent in suing within reasonable time after becoming aware that suit would be required

or after becoming aware of the facts concealed by the unconscientious or fraudulent act. *Johns Hopkins Hospital*, 48 Md.App. at 562, 429 A.2d 538. Dr. Decker had the 1973 x-rays in January 1977. He gave his opinion as to malpractice in July 1977. Suit was not filed until almost a year later. In *Nyitrai v. Bonis*, 266 Md. 295, 292 A.2d 642 (1972), the Court of Appeals held that a similar eleven-month delay showed a lack of diligence that was fatal to an estoppel claim. We hold that the delay from July 1977 to June 1978 would have the same effect here, even were there a factual basis for applying estoppel in the first place.

In the concluding portion of her brief, Ms. Levy asserts that this case presents serious policy questions:

Should [she] be penalized when information essential to her acquiring a cause of action is in the sole possession of the possible tortfeasor and is withheld over a period of years? Should health care providers be encouraged to withhold such information for protracted periods ...?

... Should the filing of unsubstantiated medical malpractice claims, before reliable supporting medical opinion is available ... in order to avoid the risk of a limitations defense, be favored?

Naturally, the answer to all of these questions is "no". Our decision in this case favors none of these undesirable policies, for as we have attempted to show, the evils assumed by Ms. Levy were not presented in the record before us. The problem this case demonstrates is a failure to investigate a claim with reasonable diligence once the claimant, according to her own testimony, was put on inquiry. The policy involved is this:

Statutes of limitation find their justification in necessity and convenience rather than logic. They represent expedience rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost [citation omitted].... They represent a public policy about the privilege to litigate.

*Walko Corp. v. Burger Chef,* 281 Md. 207, 210, 378 A.2d 1100 (1977) (quoting *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945)).

Ms. Levy has lost her "privilege to litigate." Since her claim was barred by limitations, the judgment in her favor must be reversed.

JUDGMENT REVERSED. APPELLEE TO PAY THE COSTS.