484 A.2d 275

James Francis O'HARA, III, et al.

v.

Irvin KOVENS, et al.

No. 10, Sept. Term, 1984.

Court of Special Appeals of Maryland.

Nov. 30, 1984.

Paul Mark Sandler, Baltimore, with whom were W. Michael Mullen, and Freishtat & Sandler, Baltimore, on brief, for appellants.

M. Albert Figinski, Baltimore, with whom were Arnold M. Weiner, H. Russell Smouse, Donna C. Sanger, Melnicove, Kaufman, Weiner & Smouse, P.A., Michael E. Marr and Marr, Bennett & Carmody, Baltimore, on brief, for appellees.

Argued before WEANT, BLOOM and GETTY, JJ.

BLOOM, Judge.

On November 22, 1978, the appellants herein, Michael and James O'Hara, individually and as guardians for their mother, Josephine O'Hara,[1] filed a civil action in the Superior Court of Baltimore City (now part of the Circuit Court for Baltimore City) against the appellees, former Governor Marvin Mandel, W. Dale Hess, Harry W. Rodgers III, William A. Rodgers, Ernest N. Cory Jr., Irving T. Schwartz, Eugene B. Casey, and Irvin Kovens, collectively referred to as the Kovens Group. The declaration alleged common law fraud and violations of the Maryland Securities Act in connection with the Kovens Group's acquisition of the O'Hara's stock in the corporation that owned and operated the Marlboro Race Track.[2] The Kovens Group pleaded

---

1. Mrs. O'Hara died after suit was filed. Michael and James O'Hara, as personal representatives of her estate, were substituted for the guardians.

2. A similar action had been filed in the United States District Court for the District of Maryland, claiming federal jurisdiction under the Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b). That suit also alleged violation of the Maryland Securities Act and common law fraud. The federal claim was dismissed on limitations grounds and the state claims were dismissed for lack of jurisdiction. The United States Court of Appeals for the Fourth District affirmed the dismissal,

**622**

limitations as a bar to all claims; the O'Haras conceded that the Securities Act violations claim was barred by that Act's one year statute of limitations, Md. Corps. & Ass'ns Code Ann. § 11–703(f)(2)(ii), but maintained that the statute of limitations applicable to the fraud claim did not begin to run until they discovered the fraud, which was less than three years prior to the filing of their suit.

After extensive discovery proceedings, appellees' motion for summary judgment on their plea of limitations was granted and judgment was entered for the defendants. In this appeal from that judgment, the O'Haras contend that:

I. The trial court erred in determining that in this case the accrual date for limitations under the discovery rule should be determined by the court and not a jury, because the issue involves interpretation of inferences, state of mind, and evaluation of credibility, about which reasonable persons could differ.

II. The accrual date for limitations applicable to the O'Hara children does not apply to Mrs. O'Hara when her children served as *de facto* guardians, because her estate would be improperly penalized without a legal remedy.

We disagree with the first contention but agree with the second. Accordingly, we will affirm the judgment as to Michael and James O'Hara but reverse it as to the estate of Josephine O'Hara.

### Factual Background

By the passage of House Bill 1128 during the 1971 legislative session, the Maryland General Assembly greatly increased the value of appellants' race track stock by transferring eighteen racing days from the Hagerstown Race Track to the Marlboro Race Track in Prince George's County. Then Governor Mandel vetoed HB 1128 on May 28,

*O'Hara v. Kovens,* 625 F.2d 15 (4th Cir.1980), *aff'g* 473 F.Supp. 1161 (D.Md.1979).

1971, thereby reducing the value of appellants' stock. In December of that year, the O'Haras sold their stock to appellee Ernest Cory for $12 per share, a price which they considered to be fair without Marlboro's acquisition of the additional racing days. The O'Haras knew that Cory was acting for undisclosed principals, and they concluded that the purchasers were persons with sufficient political influence to obtain additional racing days for Marlboro. Appellants were not surprised, therefore, when the General Assembly overrode the governor's veto of HB 1128 on January 12, 1972, just two weeks after the stock sale to Cory, making that stock worth considerably more than the $12 per share the O'Haras received for it. Later, a bill was passed consolidating Marlboro with Bowie Race Track, further increasing the value of the Marlboro stock.

Subsequent to the veto override, various members of the Kovens Group became the subject of a federal grand jury investigation by the United States Attorney's Office. The investigation concerned political corruption in Maryland and in particular focused on allegations that various friends and political fund raisers of Marvin Mandel had received lucrative business contracts in exchange for political and financial favors rendered to the former governor.[3] Beginning in 1973, widespread media coverage accompanied the investigation and included speculation that the race track had been purchased by friends of Mandel. Front page newspaper articles in early 1975 reported that Harry Rodgers and his brother William Rodgers, along with Dale Hess, had held undisclosed ownership interests in Marlboro Race Track. Although Mandel himself was not formally notified that he

---

**3.** The investigation was connected with the grand jury investigation of former Vice President Spiro Agnew and former Baltimore County Executive Dale Anderson, both of whom eventually resigned from office. In reference to the Mandel administration, the investigation at first focused on the contracting firm of Zollman & Associates, in which Tidewater Insurance Company had an interest. Tidewater Insurance Company was in turn partly owned by Harry Rodgers and Dale Hess, who had been successful and productive fund raisers for Mandel.

was a subject of the investigation until late in June 1975, newspaper headlines in April of that year revealed that Mandel's biggest political fund raiser, Irvin Kovens, had loaned $200,000 to Harry Rodgers to purchase an interest in Marlboro Race Track. In November 1975 the press reported that Ernest Cory and Irving Schwartz, another Mandel associate, had testified before the grand jury in connection with the race track deal. On March 15, 1975, Ernest Cory admitted that he had acted as the front man for a group of close political and personal associates of Mandel in concealing their interest in Marlboro Race Track.

Cory's admission made the headlines, and days later newspaper articles emerged suggesting that Schwartz also held an undisclosed interest in Marlboro Race Track. Although Mandel initially denied knowledge of the undisclosed ownership interests of Dale Hess and Harry Rodgers, on April 3, 1975, Mandel's admission that he knew of the track purchase made the headlines. In addition to publicity concerning his secret role in the acquisition of Marlboro Race Track, Irvin Kovens received national media attention as the target of a nationwide graft probe. National publications reported the investigation of the 1971–72 race track purchase by July of 1975, and local newspapers covered the affair on a daily basis. Finally, on November 24, 1975, Marvin Mandel and all but two of the defendants here were indicted by the federal grand jury.

Nearly three years after the indictments, the O'Haras instituted this lawsuit. The declaration somewhat abstrusely alleged that Mandel and the other members of the Kovens Group knowingly and intentionally conspired to acquire the controlling interest in the Marlboro Race Track. The gravamen of the suit was that the Kovens Group conspired to accomplish the veto of HB 1128 as well as the subsequent override of the veto in a fraudulent scheme to obtain the O'Haras' stock at a reduced price. The O'Haras claimed that when Cory purchased their stock he was acting for Irving Schwarz, who was in turn acting for Irvin Kovens. In addition, the pleading alleged that the former

governor and his associates induced the General Assembly to pass the race track consolidation bill, which further augmented the value of the Marlboro stock.

## APPLICABILITY OF THE SUMMARY JUDGMENT RULE TO THE STATUTE OF LIMITATIONS

Appellants' first argument is that summary judgment on the issue of limitations was inappropriate because material facts relating to the date their cause of action accrued were in dispute. According to appellants, disputed issues of fact included:

(1) whether it could be inferred from circumstantial evidence that appellants were aware that Mandel vetoed HB 1128 in conjunction with the Kovens Group's conspiracy to devalue the O'Hara stock;

(2) whether, under the circumstances of this case, the O'Haras acted with due diligence and prudence; and

(3) whether the O'Haras had an effective means to conduct an investigation, if they were charged with implied notice of questionable circumstances.

We begin our consideration of that argument with a discussion of the principles governing summary judgments.

### *Summary Judgment*

The summary judgment rule, as of the date judgment was entered in this case, provided that when sought, summary judgment "shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Former Md.Rule 610 d 1. The current rule, Rule 2–501(e), although different in language, is identical in effect to that portion of the former rule quoted above.

The function of the summary judgment procedure is not to try the case or decide issues of fact. It is merely to determine whether there is an issue of fact to be tried and,

if there is none, to cause judgment to be rendered accordingly. *Coffey v. Derby Steel Co.,* 291 Md. 241, 434 A.2d 564 (1981); *Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980). If properly granted, a summary judgment does not usurp the function of the jury. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 389 A.2d 887 (1978). The court does not attempt to decide any issue of fact or of credibility but only whether such issues exist. If the affidavits or other evidence disclose the existence of a genuine conflict as to material facts, the court must deny the motion and leave the resolution of that conflict to the trier of fact. *White v. Friel,* 210 Md. 274, 123 A.2d 303 (1955). Thus, the function of the judge is much the same as that which he performs at the close of all the evidence in a jury trial when motions for directed verdict or requests for peremptory instructions require him to determine whether an issue requires resolution by a jury or is to be decided by the court as a matter of law. *Berkey v. Delia, supra,* 287 Md. at 305, 413 A.2d 170. In *Berkey,* the Court, quoting *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256 (1970), said, " '[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact.' " 287 Md. at 305, 413 A.2d 170. The Court in *Berkey* also pointed out that "in reviewing a motion for summary judgment the facts must be considered most favorably to the party opposing the motion." *Id.* at 306, 413 A.2d 170.

We proceed now to a discussion of the statute of limitations in the context of the summary judgment rule.

### Limitations in Tort Actions

The statute of limitations applicable to appellants' claim is Md.Cts. & Jud.Proc.Code Ann., § 5–101, which provides:

A civil action at law shall be filed within three years from the date it accrues unless another provision of the

Code provides a different period within which an action shall be commenced.[4]

As Judge Adkins recently pointed out for this court in *Lutheran Hospital v. Levy*, 60 Md.App. 227, 482 A.2d 23 (1984), a fundamental question arising under the statute is when a cause of action accrues. When it was deemed, as it formerly was in most tort cases, that the cause of action accrued when the tort occurred, that question was usually simple to answer. Under the "occurrence of the wrong" test, there was little basis for factual dispute, so limitations was a matter left to judicial determination. The statute of limitations, therefore, was recognized as a proper ground for granting a motion for summary judgment. *See* Note, 41 Md.L.Rev. 451 (1982). An exception to the "occurrence of the wrong" test, recognized as early as 1917, was an action for medical malpractice, to which the Court of Appeals applied the "discovery of the wrong" test. *Hahn v. Claybrook*, 130 Md. 179, 100 A. 83 (1917). This "discovery of the wrong" test was eventually made applicable to all tort actions in *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981), in which the Court of Appeals traced the gradual application of the "discovery" rule in this state[5] and concluded that plaintiffs who might be "blamelessly ignorant" of the fact that a wrong has occurred should not be "charged with slumbering on rights they were unable to ascertain." 290 Md. at 635.

---

**4.** One statutory exception is § 5–201, tolling the statute for persons under a disability. Another is § 5–203, providing that when a party is kept in ignorance of a cause of action through fraud, the cause of action accrues when the party discovered or by the exercise of ordinary diligence should have discovered the fraud. Md.Cts. & Jud.Proc.Code Ann., §§ 5–201, 5–203.

**5.** After *Hahn v. Claybrook*, the "discovery" rule was extended to other areas of professional malpractice as well as to cases of faulty construction. *See Callahan v. Clemens*, 184 Md. 520, 41 A.2d 473 (1945). Eventually the "discovery" rule was extended to suits involving latent diseases. *See Harig v. Johns-Manville Products Corp.*, 284 Md. 70, 394 A.2d 299 (1978).

■ The rule, as stated in *Poffenberger*, is that a "cause of action accrues when the claimant knew or reasonably should have known of the wrong." 290 Md. at 635, 431 A.2d 677. As noted in *Lutheran Hospital v. Levy, supra,* at 233, 482 A.2d 23, mere constructive knowledge is not enough; the rule as explicated in *Poffenberger*

contemplates actual knowledge—that is, express cognition, or awareness implied from

knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.

■ Since the "discovery rule" requires actual knowledge of at least some facts or circumstances to constitute the accrual of the cause of action, appellants assert that *Poffenberger* has diminished the role of the trial judge in determining the accrual date of a cause of action. They argue that since the extent of the claimant's knowledge as of a particular date is an issue of fact, that issue must be submitted to the trier of fact; the decision is not for the judge to make. As Judge Lowe noted for this court in *Johnson v. Nadwodny*, 55 Md.App. 227, 231, 461 A.2d 67 (1983), the change from the "occurrence" rule to the "discovery" rule "traumatically affected the relative ease with which a court could apply limitations as a matter of law because the crucial accrual date is no longer so clearly ascertainable."

In *Johnson v. Nadwodny, supra,* we upheld the granting of a directed verdict for the defendant because, by her own admission, the facts upon which the plaintiff's asserted cause of action was based were within her knowledge more than three years prior to the filing of her suit. In *Lutheran Hospital v. Levy, supra,* we held that the trial court erred in denying the defendant's motion for directed verdict because the plaintiff admittedly had actual knowledge, more than three years before suit was filed, of such facts and circumstances as to put her on notice that she may have been tortiously injured. These cases are not particularly

instructive on the issue raised by appellants, however, since the accrual date in both was easily ascertainable from undisputed facts.

Appellants' argument is not lacking in logic, and it might even be persuasive if we were writing on a clean slate. As we have noted, however, *Poffenberger* did not announce a new principle of law; it merely extended the application of a well established concept from a narrow range of cases to all actions in tort. The very point in issue was decided by this court in *Decker v. Fink*, 47 Md.App. 202, 422 A.2d 389 (1980), *cert. denied* 289 Md. 735 (1981). In *Decker*, a pre-*Poffenberger* medical malpractice case, we held that under the "discovery rule" exception to the "occurrence of the wrong" test, limitations is still a matter for the judge rather than the jury even if the facts concerning discovery are disputed.

*Decker* involved the granting of a directed verdict but, as we have seen, the function of the judge is much the same whether ruling on a motion for directed verdict or a motion for summary judgment. *Berkey v. Delia, supra*, 287 Md. at 305, 413 A.2d 170. In either situation, the general rule is that all conflicts in the evidence are to be resolved in favor of the plaintiff; the court must assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the right of the plaintiff to recover. Any choice as to what evidence to believe or what inferences to draw from the evidence should not be made as a matter of law but should be submitted to the trier of fact. Nevertheless, as Judge Liss pointed out for this court in *Decker*, there is an exception to that general rule

> when such motion [for directed verdict or summary judgment] is predicated upon a purely legal question (such as limitations) which would end the case if, from the plaintiff's own case, that issue is found factually to apply. In such instance the judge becomes the factfinder for purposes of determining the applicability of the statute of

limitations and we may not set aside his factual findings unless he was clearly in error.

47 Md.App. at 211, 422 A.2d 389; Md.Rule 1086. *See also, Moy v. Bell,* 46 Md.App. 364, 368–69, 416 A.2d 289 (1980).

Consequently, we will review the decision of the hearing judge in light of the *"clearly erroneous"* standard. In so doing, we note that the evidence pertaining to the accrual date of the statute of limitations is not the same for Michael and James O'Hara as it is for their mother.

### Michael and James O'Hara

In his deposition, appellant Michael O'Hara admitted that he was well aware of the extensive publicity that preceded and then attended the indictment and trial of the appellees. We will not attempt to summarize the pertinent information contained in the newspapers that Michael acknowledges he read. It is sufficient to note that well in advance of November 22, 1975 (that is, more than three years prior to the filing of this suit) those newspaper articles contained information that was more than adequate to raise suspicion of a conspiracy among the members of the Kovens Group concerning Marlboro Race Track that greatly affected the value of the stock Michael had sold to Cory. Michael contends, however, that the knowledge he was able to glean from the newspaper accounts was insufficient to trigger an awareness of his cause of action for two reasons: (1) the publicity primarily concerned the veto override and subsequent merger legislation, not the veto itself and (2) even if he had reason to suspect that he had been defrauded, he had no means of pursuing an investigation to discover facts that would prove his suspicions.

With respect to the first point, Michael asserts, correctly, that knowledge of a scheme to increase the value of the Marlboro Race Track by the veto override and subsequent merger would not be knowledge of a cause of action. The O'Haras expected the purchaser(s) of their stock to have enough "clout" to restore the additional racing dates; they

could not have been damaged by wrongful conduct occurring *after* they had sold their stock. Only if the scheme went back to the veto that decreased the stock's value would it have constituted actionable fraud. Michael's argument that he had no reason to suspect that the plot included the veto until appellee Schwartz testified in the federal criminal trial in October 1976, however, is thoroughly illogical. Michael claims that it was Schwartz's testimony about the presence of the initials "I.K." in his checkbook and on his check stubs that triggered Michael's suspicion that Kovens caused Schwartz to buy the Marlboro track. That testimony, coupled with newspaper accounts regarding accusations of an exchange of favors by Governor Mandel and his friends as early as 1969, resulted in Michael's belief that he and his family had been swindled. But all Schwartz's testimony could have done is confirm the suggestions, which had appeared in the newspapers in early 1975, that the governor's close friend, Mr. Kovens, was connected with the transaction. The fact that Kovens had invested in Marlboro after the veto had reduced the value of the track is no more suggestive that HB 1128 was vetoed in order that he could do so than is the other information, available to appellants long before Schwartz testified, connecting Kovens with the other appellees. The hearing judge characterized Michael's contention as "arbitrary and contrived." We agree.

■ Michael O'Hara's second point is based on the language in *Poffenberger* that the statute of limitations is triggered by knowledge of circumstances sufficient to put an ordinarily prudent person on inquiry, thus charging him "with notice of all *facts which such an investigation would in all probability have disclosed* if it had been properly pursued." 290 Md. at 637, 431 A.2d 677, quoting *Fertitta v. Bay Shore Dev. Corp.*, 252 Md. 393, 402, 250 A.2d 69 (1969) (emphasis added). Pointing to the length of time required by the United States, with its subpoena power and unlimited resources, to make out a case against the Kovens Group, Michael asserts that even if he had reason to suspect he had

been defrauded before the Mandel-Kovens-Hess-Rodgers-Cory trial began, he could not realistically have discovered facts that would confirm such suspicions. In effect, he suggests, he had to let the federal prosecutors do the investigating and evidence gathering for him. That argument misconstrues the discovery rule. It is knowledge of the circumstances that ought to put a prudent person on inquiry that triggers the statute of limitations, not knowledge of the facts discoverable through such inquiry. As the hearing judge correctly noted:

> In tying their discovery date to the indictment and consequent trial testimony from which they claim sufficient evidence to proceed successfully, the plaintiffs ignore the three year interim provided by the statute before suit need be filed. The allowance of three years between suspicion and accusation is designed precisely for the purpose of giving a claimant adequate time to examine and develop evidence and to decide whether to risk bringing suit.

Or, as Judge Adkins expressed it in *Lutheran Hospital v. Levy,* "The beginning of limitations is not postponed until the end of an additional period deemed reasonable for making the investigation." 60 Md.App. at 237, 482 A.2d 23.

■ Finally, Michael advances the argument that since appellee Mandel was Governor of Maryland and thus obliged to uphold the laws of this State, there existed a fiduciary relationship, directly analogous to a confidential relationship, which justified his inaction in discovering fraud. He contends that where a confidential relationship exists, the injured party is not put on notice and therefore cannot be said to have failed to act diligently to discover the fraud. *Herring v. Offutt,* 266 Md. 593, 600, 295 A.2d 876 (1972). We concur with the hearing judge's characterization of that argument as "ingenious"; we also concur with her rejection of it. Even where a confidential relationship exists, the statute of limitations begins to run when the confiding party either has actual knowledge that the rela-

tionship has been abused or is in possession of facts sufficient to put him on inquiry which would disclose such an abuse. *Desser v. Woods,* 266 Md. 696, 709, 296 A.2d 586 (1972). Long before November 1975, through articles in newspapers he admitted reading, Michael O'Hara was aware of facts sufficient to arouse suspicion that Governor Mandel may well have abused his fiduciary responsibility to all of the citizens of Maryland.

■ James O'Hara adopted the arguments made by his brother, with, of course, the same result. There is some factual distinction between their respective positions, however. Michael admitted, in his deposition, that he read the Maryland newspapers during the time they were publishing multiple accounts of the investigation and trial of appellees; James testified he paid no attention to the newspaper accounts. He was traveling extensively to participate in various golf tournaments but returned to his home in Maryland between tournaments. Actually, James had never paid any particular attention to the Marlboro stock; he learned of the offer to purchase his stock from his mother and he sold his stock because she recommended it. He recalled speaking to his brother about the veto override but did not remember any further details.

James makes the contention, therefore, that unlike his brother, he had no actual knowledge of any facts sufficient to put him on notice. The hearing judge concluded, however,

> that an interested observer would on the basis of the publicity, have been able to entertain strong suspicion that the defendants engaged in a scheme to take advantage of the plaintiffs when they purchased the Marlboro stock.

Such finding does not ignore the requirement of *actual* knowledge referred to in *Poffenberger;* it is only a conclusion that in the case of James O'Hara mere awareness of the existence of newspaper articles referring to an investigation into the acquisition of Marlboro Race Track was

sufficient to start the running of the statute of limitations. Actual knowledge of the contents of the newspaper articles is unnecessary. As we have noted, *supra, Poffenberger* requires actual knowledge only of such facts or circumstances as would put a reasonably prudent person on inquiry. A *reasonably prudent person* in the position of James O'Hara, who had seen the value of his stock holdings rise when the legislature added racing days to Marlboro, then fall when the governor vetoed HB 1128, then rise again when the legislature overrode the veto and soar when the consolidation bill was passed, would have read the newspaper articles of which he was aware. James is charged with having the knowledge equal to Michael's; not, as appellees suggest, because it would be unfair to reward James for a lack of diligence, but because under the "discovery rule" he must be treated as if he were a reasonably prudent person even though he denies being one.

We hold, therefore, that the hearing judge was not clearly erroneous in finding that the O'Hara brothers' claims were barred by limitations. We would reach the same result even if we were to adopt the theory asserted by appellants instead of the "clearly erroneous" standard. For purposes of a motion for summary judgment on an issue of limitations in a tort case, where the "discovery rule" is invoked by the plaintiff, the only *material* fact in issue would be what knowledge the plaintiff actually had as of three years and one day prior to the filing of his suit. Where, as here, the plaintiff admittedly knew some facts related to his claim, it would still be for the judge to determine, as a matter of law, whether that admitted knowledge was sufficient to put a reasonably prudent person on inquiry. In the cases of Michael and James O'Hara, it was.

### Josephine O'Hara

With respect to the remaining claims, however, the situation is entirely different. There was no evidence from which the hearing judge could find or logically infer that Josephine O'Hara had actual knowledge of any facts per-

taining to a potential claim. Indeed, the only evidence relating to Mrs. O'Hara's state of mind clearly established that she suffered from cortical atrophy, characterized by memory lapses, delusions, senility and inability to recognize members of her own family. The condition began sometime prior to 1970; it deteriorated greatly in 1973. Medical testimony reflected that although Mrs. O'Hara's condition might have justified the appointment of a guardian for her as early as 1970 the family did not deem a guardian necessary because her assets were placed in a trust[6] and she was cared for by hired companions. Eventually, however, in November 1976, on the basis of medical certifications, Mrs. O'Hara was adjudicated mentally incompetent and her sons, Michael and James, were appointed guardians of her property and estate.

Based on that undisputed evidence, in the form of affidavits and depositions, the hearing judge concluded that there was "little question but that Mrs. O'Hara's mental condition during the period when the Mandel investigation was being trumpeted would have precluded her from following it and observing its significance to her cause of action."

Having so decided, the hearing judge then followed counsel for both sides off on a tangent to engage in a discussion of Md.Cts. & Jud.Proc.Code Ann. § 5–201(a). That statute extends the period of limitations for persons under disability by providing that

> [w]hen a cause of action subject to a limitation under Subtitle I accrues in favor of a minor or mental incompetent, that person shall file his action within the lesser of three years or the applicable period of limitation after the date the disability is removed.

Rejecting appellee's argument that this statute may only be involved in favor of litigants who had been judicially declared insane or incompetent prior to the time the cause

---

**6.** The record does not disclose what assets were placed in trust. Appellees have made no contention that limitations ran against the trustee. That issue, therefore, is not before us. Rule 1085.

of action accrued, and assuming for purposes of the summary judgment motion that Mrs. O'Hara's mental condition during the entire time the Mandel investigation was being publicized was such as to preclude her from appreciating its significance to her cause of action, the hearing judge nevertheless ruled that Mrs. O'Hara's claim was barred by limitations. Her reasoning was that since the disability which extended the period of limitations was removed by the appointment of guardians capable of recognizing and pursuing a cause of action, to permit Michael and James to pursue their mother's cause of action would produce an inequitable result. Commenting on the anomalous situation that would result if Michael and James, whose own claims were barred by inaction, were able to preserve their interests by proceeding with their mother's claim in a representative capacity, the judge observed:

> In other words, the plaintiffs cannot equitably be heard to say that Mrs. O'Hara's actual incompetency existed over the time when her cause of action otherwise accrued, but that their inaction in removing the disability by having her declared legally incompetent and themselves appointed as her guardians was a time to be controlled by their erroneous decision.

It was on this point that the hearing judge was led astray. The question of Mrs. O'Hara's disability tolling or extending the statute of limitations under § 5–201(a) was a red herring. That statute, extending the period of limitations in favor of a person under disability, does not begin to operate until after the cause of action accrues. What was overlooked in the arguments and resulting decision below was the fact that, under the discovery rule applicable to § 5–201, Mrs. O'Hara's claim did not accrue until November 1976 (less than three years before suit was filed) when guardians capable of being charged with knowledge and notice on her behalf were appointed. That is so because, on the basis of the facts before the court, Mrs. O'Hara was not capable of having the knowledge or awareness that would trigger the running of the statute. Furthermore, it is

immaterial that Mrs. O'Hara's claim is now held and asserted in a representative capacity by Michael and James, whose own claims are barred. Their failure to act prudently in the conduct of their own affairs could not affect the running of the statute of limitations as to their mother's claim. "The statute runs against the right of action, not against the holder thereof." *O'Connell v. Chicago Park District*, 376 Ill. 550, 34 N.E.2d 836, 840 (Ill.1941).

We hold, therefore, that the court erred in granting summary judgment against the personal representatives of Mrs. O'Hara's estate. The issue of limitations may again arise if, during trial, additional facts pertaining to the decedent's mental condition prior to November 1975 come to light.

JUDGMENTS AGAINST JAMES FRANCIS O'HARA, III AND MICHAEL PATRICK O'HARA AFFIRMED.

JUDGMENT AGAINST JAMES FRANCIS O'HARA, III AND MICHAEL PATRICK O'HARA AS PERSONAL REPRESENTATIVES OF THE ESTATE OF JOSEPHINE M. O'HARA REVERSED.

COSTS TO BE PAID TWO–THIRDS BY APPELLANTS JAMES FRANCIS O'HARA, III AND MICHAEL PATRICK O'HARA AND ONE–THIRD BY APPELLEES.