526 A.2d 635

**Elaine GEISZ, Personal Representative of the
Estate of Steven Geisz**

v.

**GREATER BALTIMORE MEDICAL CENTER, et al.**

No. 1347, Sept. Term, 1986.

Court of Special Appeals of Maryland.

June 9, 1987.

Diane G. Goldsmith and Howard A. Janet (Stephen L. Snyder and Snyder & Janet, on the brief), Baltimore, for appellant.

Mark D. Gately (Timothy L. Mullin, Jr., Mark A. Wesker and Miles & Stockbridge, on the brief), Baltimore, for appellee, Richards, Hirschfeld & Associates, P.A.

Roy L. Mason (Mary Alane Downs and Donahue, Ehrmantraut & Montedonico, Chartered, on the brief), Baltimore, for appellee, George J. Richards, Jr., M.D.

Joseph C. Wich, Jr., Kathleen Gallogly Cox (Cook, Howard, Downes & Tracey, on the brief), Towson, for appellee, Greater Baltimore Medical Center.

Argued before WILNER and KARWACKI, JJ., and A. OWEN HENNEGAN, Associate Judge of the Third Judicial Circuit, Specially Assigned.

WILNER, Judge.

We have before us a very serious medical malpractice case.[1] The issues on appeal concern not the alleged malpractice, however, but only whether the plaintiff brought her actions within the applicable period of limitations. The Circuit Court for Baltimore County, ruling on defense motions for summary judgment, concluded that the actions were not filed timely and, on that account, entered judgments in favor of the various defendants.

Elaine Geisz, as personal representative of the estate of Steven F. Geisz and as mother of the minor child of Steven and Elaine Giesz, alleges that in November, 1971, following a diagnosis of Hodgkin's disease, her former husband Steven was referred for treatment to Dr. George J. Richards, Jr. (Richards), who was then the head of the Radiation Therapy Department of Greater Baltimore Medical Center (GBMC). According to Ms. Geisz, Richards misrepresented his ability to treat Steven competently, improperly treated him with radiation and chemical therapy, failed to stem the spread or worsening of the cancer, and caused additional injury from the treatment, ultimately leading to Steven's death in 1975. Richards and GBMC are both named as

---

1. Initially, there were three cases (Nos. 1347, 1348, and 1349) consolidated for argument. Following oral argument, we were apprised that Nos. 1348 and 1349 had been settled, and those appeals were dismissed.

defendants, along with a professional association through which Richards practiced at the time of treatment (P.A.).

In her "survival" actions, filed pursuant to Md.Code Ann.Est. & Trusts art., § 7–401(x),[2] Ms. Geisz charges Richards, GBMC, and the P.A. with negligence (Count I), failure to obtain Steven's informed consent (Count II), and fraud (Count V). GBMC and the P.A., in addition, are charged with the negligent retention of Richards (Count III) and negligently entrusting him with radiation therapy facilities and equipment and with chemotherapy drugs (Count IV).

These actions were initially filed in Circuit Court on November 18, 1985. They had not been previously submitted to the mandatory arbitration process provided for in Cts. & Jud.Proc. art., § 3–2A–01 et seq., on the theory that the "medical injury" sued upon occurred prior to July 1, 1976.[3]

## A. *Alleged Facts*

Steven Geisz was first referred to Richards in November, 1971. The complaint alleges that (1) with appropriate treatment, he had a "high chance of complete cure" at that time and that Richards in fact told him that he had "a 95% probability of complete cure," (2) Richards directed immediate radiation therapy without consulting other physicians and without preparing a treatment plan, (3) Richards and technicians under his control administered 43 treatments between November, 1971, and January, 1972, but the treatments were inadequate to effect a cure, (4) in February, 1972, Richards began administering chemotherapy, (5) in April, 1972, the disease returned and spread, (6) from May

---

**2.** Est. & Trusts art., § 7–401(x) authorizes a personal representative to commence and prosecute "a personal action which the decedent might have commenced or prosecuted," with some exceptions and conditions not relevant here.

**3.** The Health Claims Arbitration Act, enacted by 1976 Md.Laws, ch. 235, applies "only to medical injuries occurring on and after" July 1, 1976.

to August, 1972, Richards started a second series of radiation therapy, followed by chemotherapy, (7) in November, 1972, the disease returned again, and more aggressive chemotherapy commenced, (8) in mid–1973, an increasing cardiac silhouette was noticed, leading to surgery in October to remove fluid in the heart sac, (9) in November, 1973, Mr. Geisz was referred to the University of Maryland Cancer Research Center, which took over his treatment, (10) the disease was then too far advanced for cure, and (11) Mr. Geisz died in September, 1975.

All of the acts or omissions sued upon by Ms. Geisz occurred prior to July 1, 1975. Accordingly, the statute of limitations applicable to her "survival" actions—Counts I–V—is that set forth in Cts. & Jud.Proc. art., § 5–101:[4] "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."

The issue as to those actions is when they "accrued." Ms. Geisz contends that the defendants "fraudulently concealed" their wrongdoing and thus seeks to invoke the provisions of Cts. & Jud.Proc. art., § 5–203: "If a party is kept in ignorance of a cause of action by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud."

The fraud alleged by Ms. Geisz in this regard is essentially that set forth in Count V of the amended complaint. As supplemented by her affidavit and deposition testimony, she complains of three sets of representations made by Richards.

---

4. The special statute of limitations applicable to actions against physicians for medical malpractice—Cts. & Jud.Proc. art., § 5–109—did not take effect until July 1, 1975, and was made applicable "only to injuries occurring after July 1, 1975." The expansion of that statute to include malpractice actions against other health care providers came in 1976; it applies only to "medical injuries occurring on and after [July 1, 1976]."

The first set occurred at the initial interview with Richards, prior to the commencement of treatment. Ms. Geisz asserts that Richards told her and Mr. Geisz that "he was an expert in radiation therapy," that "his Radiation Therapy Department used the most up-to-date and advanced techniques and methods in the treatment of cancer, including Hodgkin's Disease," that its results in that regard were "as good as any other hospital in the country," that GBMC had " 'the best that there was to offer' in the way of facilities, equipment, and staff," and that Mr. Geisz "had a 95% chance of cure."

These representations, she insists, which led Mr. Geisz to undergo treatment by Richards at GBMC, were false when made and were known by Richards to be false. In support of that averment, Ms. Geisz offered evidence that (1) Richards and the Radiation Therapy Department were treating far too many patients to be able to treat them competently, (2) some of the technicians employed were not properly trained and were not properly supervised, (3) the Department was understaffed and lacked adequate equipment, and (4) Richards's methodology did not comport with accepted practice. All of this, she argues, establishes that the Department did not offer the best, most up-to-date methods and techniques.

The second set of representations occurred during the course of treatment—between November, 1971 and November, 1973. Notwithstanding the worsening of Mr. Geisz's condition, Richards stated that Mr. Geisz was receiving "the best and most up-to-date treatment available" and that he was simply "one of the unfortunate people who was not responding to treatment." Having trust and confidence in Richards, the Geiszes accepted this explanation, which Ms. Geisz now asserts was knowingly false, and did not seek alternative advice or treatment.

The final set of alleged misstatements occurred in November, 1973, when, in referring Mr. Geisz to the University of Maryland Cancer Center, Richards said that "although he had given us everything available," Geisz "was 'at the

low end of the statistics' and was not responding to treatment." Even after the referral, Ms. Geisz avers, Richards's treatment was never questioned by the Cancer Center physicians:

"We never heard any statements from the staff at the Cancer Research Center to the effect that Mr. Geisz had not received the best care at GBMC. We had no cause to question or doubt that Dr. Richards had done everything available for Mr. Geisz and in fact, when other patients at the Cancer Research Center spoke highly of Dr. Richards, our admiration and trust in him was heightened."

As a result of all this, Ms. Geisz claims that she remained in ignorance of any wrongdoing until she read an article in a local newspaper in January, 1985, mentioning other malpractice actions against Richards and GBMC.

The court concluded that these averments did not suffice to show fraud and that, in the absence of fraud, Ms. Geisz's "survival" actions "accrued," at the latest, upon Mr. Geisz's death in September, 1975. That latter conclusion was based on principles enunciated in *Trimper v. Porter-Hayden*, 305 Md. 31, 501 A.2d 446 (1985). Ms. Geisz contends here that the court erred in failing to find sufficient evidence, for summary judgment purposes, of fraud and in applying the *Trimper* analysis to a malpractice action governed by Cts. & Jud.Proc. art., § 5–101.

The issue as to Ms. Geisz's "wrongful death" action is similar in some respects. That action is authorized by Md.Code Ann.Cts. & Jud.Proc. art., §§ 3–902 and 3–904. Section 3–904(g) provides, however, that "[a]n action under this subtitle shall be filed within three years after the death of the injured person." It is clear, of course, that Ms. Geisz did not meet that deadline. As with her "survival" actions, she seeks refuge in § 5–203, arguing that § 5–203 operates as a "statutory exception" to § 3–904(g), and that the defendants' fraud sufficed to extend the time for filing her action. The Circuit Court agreed with her that § 5–203 acts as an exception to § 3–904(g), but, in light of its finding that there was insufficient evidence of fraudulent conceal-

ment, concluded that, in the particular case, § 5–203 was not applicable.  Ms. Geisz defends the court's conclusion as to the legal effect of § 5–203 but challenges its finding as to the nonexistence of fraud.

### B. *Fraudulent Concealment*

As the timeliness of both the "survival" and the "wrongful death" actions hinges, in large measure, on the adequacy of Ms. Geisz's averments of fraudulent concealment, we begin our analysis with that question.

The first step in that analysis is to define the context of it.  In *O'Hara v. Kovens,* 305 Md. 280, 503 A.2d 1313 (1986), the Court observed that an issue of timeliness under a given statute of limitations may involve questions of both fact and law, and that, when the issue is raised in a motion for summary judgment, the normal standards applicable to summary judgment proceedings apply.  The motion should not be granted unless the movant is entitled to judgment as a matter of law, and if there is any genuine dispute of material fact bearing on the question, it is inappropriate to decide the question on summary judgment.  In determining whether such a genuine dispute exists, and generally whether the movant is entitled to judgment as a matter of law, the evidence before the court and all inferences fairly deducible from that evidence must be construed against the movant.  *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972); *Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980).

Under this standard, the credibility of the various affiants is not relevant.  Nor, in this setting, are the exculpatory explanations offered by Richards or by witnesses on his or GBMC's or P.A.'s behalf.  We take Ms. Geisz's averments and the evidence offered in support of them at face value, giving her every reasonable benefit of doubt, and simply look to see whether they would suffice, if believed, to permit a trier of fact to conclude that her actions were filed timely.  If so, summary judgment was inappropriate; if not, it was not only appropriate but called for by Md. Rule 2–501.

The Circuit Court rejected Ms. Geisz's claim of fraud principally on the ground that she failed to show that Richards actually believed the various statements attributed to him were false or that he made the statements with reckless disregard of their truth or falsity. The deficiency, in other words, was in proof of *scienter*. The court looked, in part, to exculpatory statements in Richards's deposition testimony, given in another case but admitted in this one as well, and denigrated contrary opinions by other witnesses as being in the nature of hindsight disagreements or evaluations.

We do not believe that summary judgment was appropriate on that basis. In the first place, though continually claiming that the treatment administered by him and GBMC was of high quality, Richards also conceded in his deposition testimony that there were serious deficiencies in the Department of which he was aware. He acknowledged that the Department was understaffed, that at least until 1975 it did not have adequate equipment, that there was no backup supervision beyond himself, that GBMC "most certainly failed to properly safeguard and preserve [medical] records," that the technicians in the Department "were negligent in the administration of radiation therapy using carelessly made diagrams of treatment fields that were unable to be related to anatomical landmarks," that, because of a shortage of personnel, "they may have taken some shortcuts in patient care that I would not most certainly have approved of," and that there was excessive waiting time for patients—"an ill patient may have waited a much longer period of time than they normally ought to have waited for their treatment." Whether or not any of this would suffice as evidence of fraud, it does at least suffice to lend an inference that Richards was aware that some of his alleged statements concerning the Radiation Therapy Department were not accurate. More important, as we observed, for purposes of summary judgment even his exculpatory statements, denials of wrongdoing, and

affirmative avowals are essentially irrelevant. The focus is on the inculpatory evidence.

■ It is there that we think Ms. Geisz fails. In order to escape the bar of a statute of limitations by invoking § 5–203, she must show more than a fraud on the part of the defendants. As noted in *Piper v. Jenkins,* 207 Md. 308, 318, 113 A.2d 919 (1955), and *Mettee v. Boone,* 251 Md. 332, 338–39, 247 A.2d 390 (1968), § 5–203 applies only "where two conditions are shown to exist: (1) where a party has been kept in ignorance of his cause of action by the fraud of the adverse party, and (2) where he himself has exercised usual or ordinary diligence for the discovery and protection of his rights." *See also Ferrucci v. Jack,* 255 Md. 523, 258 A.2d 414 (1969); *Associated Realty Co. v. Kimmelman,* 19 Md.App. 368, 311 A.2d 464 (1973); *Johns Hopkins Hosp. v. Lehninger,* 48 Md.App. 549, 429 A.2d 538, *cert. denied* 290 Md. 717, — A.2d —— (1981); *Lutheran Hospital v. Levy,* 60 Md.App. 227, 482 A.2d 23 (1984), *cert. denied* 302 Md. 288, 487 A.2d 292 (1985). General averments in this regard are not enough. As we pointed out in *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 241–42, 469 A.2d 867, *cert. denied* 300 Md. 88, 475 A.2d 1200 (1984), 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985), and again in *Lutheran Hospital v. Levy, supra,* 60 Md.App. 227, 482 A.2d 23, the party seeking to invoke § 5–203 "must state with particularity how she was kept in ignorance." *Lutheran Hospital* at 241, 482 A.2d 23.

■ Accepting as true that Richards made all of the statements attributed to him, accepting even that he knew that those statements were not true, that they were made with intent to deceive Mr. Geisz into commencing and continuing treatments at GBMC, and that they were justifiably relied upon by Mr. Geisz, they do not establish how Mr. Geisz was kept in ignorance of his causes of action after November, 1973, much less the exercise by him or by Ms. Geisz of usual or ordinary diligence for the discovery and protection of their rights.

■

Mr. and Ms. Geisz clearly knew by November, 1973 that the treatment by Richards and GBMC had not worked. Whatever their illusions may have been before, Mr. Geisz then opted to place himself in the hands of other physicians. For nearly two years, he received his care and treatment at the University of Maryland. His connection with Richards and GBMC had been severed; there were no further contacts, no further representations, no "doctoring" or concealment of records. Ms. Geisz does not indicate what kind of treatment was given to her husband at the Cancer Center, whether or how it may have differed from what Mr. Geisz received at GBMC. It is implicit from her affidavit, however, that she and her husband never inquired of their new physicians about the nature or quality of treatment received at GBMC or why Mr. Geisz had gone from a 95% probability of cure to a hopeless case. There is no indication that Richards or GBMC or the P.A. said or did anything after November, 1973, to keep them in ignorance or to cause them not to make further inquiry.

Ms. Geisz cites a number of out-of-State cases for the proposition that a denial of wrongdoing by the defendant physician—an ascribing of the patient's condition to causes other than malpractice—can constitute a fraudulent concealment sufficient to delay the running of a statute of limitations. We have no quarrel with that general proposition, but the cases in which courts have indeed found such averments to constitute concealment are quite different than what the evidence shows occurred here. In each of the cited cases, the patient remained under the care of the erring practitioner, was continually assured that the condition would heal itself or was the result of natural causes, did not learn the truth (and could not learn the truth) until examination by another practitioner, and promptly filed suit thereafter. In none of the cases was the patient in the care of another practitioner for nearly two years, with every opportunity to discover the truth; in none was there anything approaching an 11–year delay. *See Acton v. Morrison*, 62 Ariz. 139, 155 P.2d 782 (1945); *Brewington v.*

*Raksakulthi,* 584 S.W.2d 112 (Mo.App.1979); *Ray v. Schei-bert,* 224 Tenn. 99, 450 S.W.2d 578 (1969); *Fitzpatrick v. Marlowe,* 553 S.W.2d 190 (Tex.Civ.App.1977); *see also Nut-ty v. Universal Engineering Corp.,* 564 F.Supp. 1459 (S.D. Ill.1983) (where the issue was estoppel, rather than fraud); *Bowman v. McPheeters,* 77 Cal.App.2d 795, 176 P.2d 745 (1947); *Borderlon v. Peck,* 661 S.W.2d 907 (Tex.1983).

Against the exacting standard required under Maryland law to avoid a statute of limitations on the ground of fraudulent concealment, the averments and evidence offered by Ms. Geisz simply do not suffice. For that reason, we conclude that the court did not err in finding legally insufficient evidence to warrant application of § 5–203. *See Leonhart v. Atkinson, supra,* 265 Md. 219, 289 A.2d 1; *Lutheran Hospital v. Levy, supra,* 60 Md.App. 227, 482 A.2d 23.

## C. *Application of Trimper*

Having excluded the element of fraud, we now look directly to see when Ms. Geisz's cause of action "accrued."

In *Trimper v. Porter-Hayden, supra,* 305 Md. 31, 501 A.2d 446, the Court had before it "survival" and "wrongful death" actions based on the decedent's exposure to asbestos during his working career. The actions were brought more than three years after the death of the decedent but, allegedly, within three years after the plaintiff learned, or with reasonable diligence could have learned, that the decedent's latent disease and death were associated with his exposure to asbestos. The question addressed by the Court was whether those actions "are time barred when brought more than three years after death or whether some form of discovery rule applies." *Id.,* at 32, 501 A.2d 446.

The answer as to the "wrongful death" action was direct. Cts. & Jud.Proc. art., § 3–904(g) requires such an action to be filed within three years after death; that, said the Court, is a "condition precedent to the right to maintain the action," (citing *Slate v. Zitomer,* 275 Md. 534, 341 A.2d 789 (1975), *cert. denied* 423 U.S. 1076, 96 S.Ct. 862, 47

L.Ed.2d 87 (1976), *and Smith v. Westinghouse Electric Corp.*, 266 Md. 52, 291 A.2d 452 (1972)) and cannot be enlarged or modified "in the guise of statutory construction." *Trimper*, 305 Md. at 35–36, 501 A.2d 446. The requirement is clear; "[t]here is no room for judicial interpretation." *Id.*, at 36, 501 A.2d 446. The "wrongful death" action filed by Ms. Geisz is very clearly barred under *Trimper*.

The Court's analysis of the "survival" action was somewhat more deductive. It traced the development of the "discovery" rule and its application to malpractice cases, culminating with the announcement in *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981), that the "discovery" rule is applicable generally in all tort actions. The Court hastened to point out, however, that none of the cases, including *Poffenberger*, involved "an injured person who had died, either due to the injury complained of or from some other cause, without having brought suit based on the injury" and thus did not "expressly or by necessary implication address the issue now before us." *Id.*, at 41, 431 A.2d 677.

Recognizing that it was writing on a clean slate, the Court reviewed a number of decisions from other States and under the Federal Tort Claims Act, some involving latent disease, others involving traumatic injury, concluding from its examination that "the weight which one might assign to the competing, and indeed conflicting, considerations can vary depending on whether the case involves a latent disease, medical malpractice, strict products liability, lack of knowledge of the fact of death, or some other theory of liability or other factor." *Id.*, at 49, 431 A.2d 677. The Maryland cases themselves, it observed further, demonstrate a "high degree of flexibility in the judicial interpretation of 'accrues' in CJ § 5–101." *Id.*, at 49–50, 431 A.2d 677. Thus, the Court continued, "[a] construction of § 5–101 in terms of after death claims and the discovery rule need not be one applicable to all types of cases initially instituted as a survival action." *Id.*, at 50, 431 A.2d 677.

The predeliction for flexibility logically precluded any broad *Poffenberger*-type answer to the question, and so the Court limited its further analysis to the circumstances then before it—latent disease cases. Its ultimate conclusion was that the "survival" action "accrued" upon and at the time of the decedent's death, if not earlier, and that the three-year period allowed by § 5–101 began to run at least at that time. The Court seemed to base that conclusion, at least in part, on the facts that (1) "the liability issues and the defenses will ordinarily be the same in both wrongful death and survival cases" and that commencement of the limitations period from the decedent's death in the survival case would be consistent with the clear legislative determination expressed in § 3–904(g) that liability should not remain open for any longer period, and (2) under the Workmen's Compensation law, a claim based on death from latent occupational disease must be filed within a fixed period after the death.

■ Because the Court carefully limited its holding to cases involving latent disease, the conclusion reached in *Trimper* is not direct, binding precedent in the case before us. Ms. Geisz, indeed, argues that it should be limited to latent disease cases. We do not agree. We find nothing in *Trimper* suggesting that the parity between "survival" and "wrongful death" actions in this regard was intended to be limited solely to latent disease cases. We see the Court's reluctance to announce any broader rule in that case as merely a fidelity to its declared principle of flexibility, of not wishing to lay down a broad rule applicable to circumstances it could not then foresee, and thus of not deciding more than it had to decide. We are persuaded that the "three years from death" rule applied in *Trimper should* be applied to a "survival" action based on medical malpractice.

As the *Trimper* Court pointed out, the decision to apply the § 3–904(g) standard involves a balancing of competing interests. One of the two factors noted by the Court was the near identity of liability issues and defenses in both the "survival" and "wrongful death" cases, which would tend

to exist as well in medical malpractice cases. Beyond that, we see no greater or different detriment accruing to a personal representative in a malpractice case than has been imposed in a latent disease case. Indeed, the existence and cause of injury is usually (although certainly not always) easier to discover in the malpractice setting than in the latent disease case. And we see no good reason why a practitioner called upon to defend specific acts, omissions, or advice should be less favored by a statute of repose than a person or entity asked to defend whether, or the circumstances under which, a decedent was exposed to some harmful substance.

For these reasons, we conclude that the court correctly applied the "accrual" principle applied in *Trimper*, that it correctly determined that Ms. Geisz's actions were not timely filed, and that it therefore properly entered judgment in favor of the defendants.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.